UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RODNEY KEITH WRIGHT,

                   Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.

---

**MEMORANDUM AND ORDER**

19-CV-2700 (LDH)

LASHANN DEARCY HALL, United States District Judge:

Plaintiff Rodney Keith Wright, proceeding pro se, appeals the denial by the Commissioner of Social Security (the "Commissioner") of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Commissioner moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

## BACKGROUND[1]

### I.    Non-Medical Evidence

Plaintiff was born in May 1972. (Tr. 55.) From 1990 to 2006, Plaintiff served as a reservist in the U.S. armed forces. (Tr. 44–45, 185–88, 215, 1087.) In 1997, Plaintiff began a career providing accounting and tax preparation services. (Tr. 43–44, 406.) From 1997 to 2000, Plaintiff worked on Wall Street as an accounting consultant for Fortune 500 firms. (Tr. 44, 50, 215.) Plaintiff stopped performing accounting work in 2000 due to his impairments. (Tr. 44, 185, 215, 1083–84.) Plaintiff's income consists of real estate rental income from properties he owns and service-connected disability compensation from the Department of Veterans Affairs (the "VA"). (Tr. 42–44, 1083–85.)

---

[1] The following facts are taken from the administrative transcript, cited in this opinion as "Tr." (ECF No. 9.)

At his first administrative hearing on July 13, 2015 (the "2015 Hearing"), Plaintiff testified that his fibromyalgia is the main reason he is unable to work.  (Tr. 45.)  He testified that he is unable to sit for extended periods due to widespread body pain, tender points, stiffness, and migraine headaches.  (*Id*.)  Plaintiff also described trouble standing for long periods due to an Achilles tendon tear.  (Tr. 48.)  Plaintiff testified that his various medications cause him drowsiness and irritability and that he is constantly fatigued from poor sleep.  (Tr. 46.)  He described suffering from bulging discs in his neck and back caused by an in-service accident.  (Tr. 45.)  In 1990, a motorist struck Plaintiff while he was parked inside his vehicle, causing his vehicle to flip on its side.  (Tr. 698–99.)  Plaintiff received a concussion.  (*Id*.)

At his second administrative hearing on March 30, 2018 (the "2018 Hearing"), Plaintiff stated that a traumatic brain injury from his 1990 accident caused him memory loss and personality changes.  (Tr. 1086.)  For example, he was "forgetting accounting procedures" and could no longer do his accounting work.  (*Id*.)  His anxiety and aggression caused him to lose his consulting jobs.  (*Id*.)  Plaintiff testified that his fibromyalgia and other body pain caused him to miss military drills, forcing him to leave the military.  (Tr. 51.)  Plaintiff maintains that because of his fibromyalgia, he cannot cook, clean, do laundry, or grocery shop, and that his wife takes care of these activities.  (Tr. 1088.)  Plaintiff also maintains that he sometimes has trouble getting out of bed due to body pain and that he experiences migraines, which occur three to four times a month and leave him bedridden.  (*Id*.)  Plaintiff only leaves the house for doctor's appointments and other important needs, and he is driven by his wife.  (Tr. 1083, 1088.)

## II.    Vocational Expert Testimony

Vocational experts ("VE") Michael Smith and Carl Robert Schultz testified at both hearings.  (Tr. 37–54; 1090–92.)  The ALJ asked a series of hypothetical questions focused on

Plaintiff's vocational profile and capacity to perform sedentary work.  (Tr. 51; 1090–92.)  VE Smith testified that Plaintiff could perform work available in the national economy, including: (1) Order Clerk; (2) Bench Hand; and (3) Telephone Quotation Clerk.  (Tr. 1090-92.)  VE Schultz testified that Plaintiff could perform work available in the national economy, including: (1) Surveillance Systems Monitor; (2) Order Clerk; and (3) Lens Inserter.  (*Id*.)

## III.    Relevant Medical Evidence

The medical evidence in the record consists of the following: (1) treatment records from the Northport Veterans Affairs Medical Center ("Northport VAMC"); (2) treatment records from Dr. Christine Fitzpatrick of Neurology Associates; (3) MRIs and examinations by Doshi Diagnostics Imaging Services and Sinai Diagnostics & Interventional Radiology, P.C.; (4) a service-connected disability determination from the VA; (5) consultative examinations by Dr. Fkiaras and Dr. Thurkal; (6) opinion statements from Dr. Clark and Dr. Gussoff; and (7) clinical notes from Dr. Simon Raskin.

On June 15; July 22; and August 23, 2011; and on January 18, and June 19, 2012, physical and neurological examinations conducted were unremarkable.  (Tr. 823–25, 834, 841, 846, 850.)  Plaintiff had full orientation, no focal or gross deficits, no motor strength or gait abnormalities no sensory deficits, no spinal tenderness, and no cyanosis, clubbing, or edema. (*Id*.)

On July 22, 2011, an MRI of the left shoulder showed possible calcific tendinopathy within the supraspinatus tendon insertion and suggestion of degeneration of the inferior labrum of the coronal T1 level.  (Tr. 580–81.)  On September 20, 2013, an MRI of the left shoulder showed mild supraspinatus and infraspinatus tendinosis without cuff tear.  (Tr. 248, 1379.) Despite Plaintiff's complaints of pain, on clinical examination, the left shoulder presented with

normal signs, including full range of motion, no tenderness to palpation over the acromioclavicular joint, and no evidence of impingement. (Tr. 1376.) An x-ray of the cervical spine showed mild degenerative disc disease along with normal lordosis and no evidence of fracture or subluxation. (Tr. 249.) As for the lower back, x-rays of the lumbar spine showed normal findings, and a CT-scan of the abdomen and pelvis conducted on May 14, 2015, showed no positive signs other than grade 1 retrolisthesis and mild disc bulge at the L5-S1 level. (Tr. 252, 575.) On October 2, 2013, an MRI study of the right ankle showed a low-grade interstitial tear of the Achilles tendon and an intermediate grade partial thickness tear of the anterior talofibular ligament and calcaneofibular ligament. (Tr. 381, 393–94.)

On September 24, 2013, Dr. Christine Fitzpatrick noted that Plaintiff could recall three out of three objects immediately and one out of three objects after five minutes. (Tr. 2443.) Dr. Fitzpatrick also noted full orientation, fluent speech, intact cranial nerves, and intact visual acuity and visual fields. (*Id.*) On September 26; October 8; November 5; and December 13, 2013, Dr. Fitzpatrick noted similar findings. (Tr. 2439, 2441, 2448, 2450.) An MRI study of the brain, a carotid duplex scan, and transcranial Doppler studies were all within normal limits. (Tr. 2441, 2445–2447, 2449.)

Clinical notes from Dr. Simon Raskin, the treating podiatrist, dating back to September 2013, showed pain of the right foot arch and right ankle on palpation with collapsed arches on weightbearing and mild edema. (Tr. 947–48, 951, 1392–1403.) Dr. Raskin found no clinical signs of varicosities or palpable nodules or indurations and noted that reflexes were 2/4 bilaterally and that vibration perception, two-point discrimination, pressure and light touch sensation, vagal nerve function, and muscle power were intact bilaterally. (Tr. 1392–1403.)

4

On June 13, 2014, an MRI of the right ankle showed no evidence of a tendon rupture, fracture, or focal lytic lesion.  (Tr. 1413.)  On July 31, 2014, the neurologist noted that the onset of memory loss was "vague," and that despite Plaintiff's claims of getting lost in his own home or when walking around the VA, Plaintiff had no difficulty driving his car locally or with a GPS and was working part-time as a tax preparer out of his home.  (Tr. 344.)  The neurologist concluded that the cognitive complaints were out of proportion to the reported injury, possibly being of emotional etiology.  (Tr. 345, 704.)

In December 2014, Plaintiff had a consultative medical examination with John Fkiaras, M.D.  (Tr. 509–520.)  Dr. Fkiaras diagnosed fibromyalgia, asthma, sleep apnea, right ankle pain, chronic headache, migraine headache, neurocognitive disorder, social anxiety disorder, persistent depressive disorder, hypertension, generalized myalgias and arthralgias, history of traumatic brain injury, and history of partial right Achilles tear.  (Tr. 512–13.)  Dr. Fkiaras opined that Plaintiff could lift and/or carry up to 10 pounds and could sit up to 4 hours in an 8-hour workday, stand up to 45 minutes, and walk up to 40 minutes.  (Tr. 516.)  Dr. Fkiaras also opined that Plaintiff could not push or pull or operate foot controls and could not climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.  (Tr. 517–18.)

On May 15, 2015, an internal medicine examination by consultative physician Dr. Vinod Thurkal showed that Plaintiff had no limitations for sitting or standing but had mild limitations on pulling, pushing, lifting, carrying due to neck pain, low backache, and fibromyalgia.  (Tr. 558–69.)  Dr. Thurkal opined that Plaintiff could lift and/or carry up to 20 pounds and in an 8-hour workday, could sit, stand, and/or walk up to 8 hours, could use feet and hands frequently, and could engage in postural activities like balancing, stooping, kneeling, crouching and crawling frequently.  (*Id.*)

Bernard Gussoff, M.D., a medical expert, completed a medical source statement regarding Plaintiff's physical abilities in August 2015. (Tr. 892–901.) He opined that Plaintiff could lift/carry up to 20 pounds occasionally and up to 10 pounds frequently; sit six hours in a workday; and stand/walk four hours in a workday. (Tr. 892–93.) Rita Clark, M.D., a medical expert, also completed a medical source statement regarding Plaintiff's mental abilities in August 2015. (Tr. 884–91.) Dr. Clark wrote that Plaintiff could perform simple, low stress work with limited public contact. (Tr. 891.)

On May 20, 2016, a CT-scan of the ankles showed signs consistent with minimal bilateral Achilles tendinosis and with "remote" ankle sprains. (Tr. 1436–37.) On June 24, 2016, Plaintiff presented with a normal gait "in sandals," normal muscle power bilaterally, full active ankle plantar and flexor strength bilaterally, and full motion of all pedal and motion joints bilaterally. (Tr. 1434–35.) On September 21, 2016, an x-ray of the cervical spine showed signs of minimal spondylosis at the C5-6 and C6-7 levels but no fracture or subluxation. (Tr. 1576, 1597.) On November 10, 2016, Plaintiff presented with independent ambulation, non-tenderness of the cervical, thoracic, or lumbar paraspinals, and full range of motion. (Tr. 1576–77.) On July 28, 2017, an x-ray of the knees showed minimal suprapatellar effusion on the right only and no fracture or dislocation bilaterally. (Tr. 1513–14.) On November 6, 2017, an imaging study showed signs consistent with minimal, if any, Achilles tendinosis on the right ankle. (Tr. 1497–98.)

## IV.   The VA's Rating Decision

On October 23, 2014, psychiatrist Dr. Wing examined Plaintiff in the context of a service-connected disability determination from the VA and noted findings of social anxiety disorder and mild neurocognitive disorder. (Tr. 530–51.) In its rating decision dated November

24, 2014, the VA found that Plaintiff had service connections for persistent depressive disorder with social anxiety and neurocognitive disorder granted with an evaluation of 50%.  (Tr. 916.) Service connection for fibromyalgia was granted with an evaluation of 40%.  (*Id*.)  Plaintiff's combined rating as of July 18, 2014 was 70%.  (Tr. 909–15.)  In its rating decision dated December 23, 2014, the VA granted entitlement to individual unemployability effective July 18, 2014.  (Tr. 525–27.)  The decision explained that the previous rating denied entitlement because Plaintiff had been working; however, at the time of the decision, Plaintiff earned less than the threshold amount for marginal employment.  (Tr. 526.)  Plaintiff had 70% service connection disabilities in the areas of major depressive disorder and fibromyalgia.  (*see* Tr. 600.)

## V.    Plaintiff's DIB Application

Plaintiff applied for DIB on August 24, 2014, alleging disability since July 9, 2011.  (Tr. 110–18.)  Plaintiff's application was denied on September 29, 2014.  (Tr. 56–62.)  Following the 2015 Hearing, an administrative law judge ("ALJ") issued a decision on October 5, 2015, finding Plaintiff not disabled.  (Tr. 14–32.)  On December 21, 2015, the Appeals Council denied Plaintiff's request for review.  (Tr. 1–4.)  Plaintiff commenced a civil action on February 26, 2016.  (*See* 16-cv-00898, ECF No. 1.)  On May 11, 2017, the Honorable Carol Bagley Amon remanded the case for further administrative proceedings.  (Tr. 1094–1109.)  On January 11, 2018, the Appeals Council vacated the Commissioner's decision and remanded the case to the ALJ for further development of the record.  (Tr. 1268–69.)  Following the 2018 Hearing, the ALJ issued a decision on May 30, 2018, again finding Plaintiff not disabled.  (Tr. 991–1010.) Plaintiff submitted written exceptions to the Appeals Council in December 2018.  (Tr. 1350). The Appeals Council concluded that the exceptions did not provide a basis for changing the ALJ's decision, making the ALJ's May 30, 2018 decision the final decision of the

Commissioner. (Tr. 978–83.) Plaintiff commenced the instant action on May 2, 2019. (ECF No. 1.)

## STANDARD OF REVIEW

Under the Act, a disability claimant may seek judicial review of the Commissioner's decision to deny him application for benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *8 (E.D.N.Y. Sept. 11, 2012). In conducting such a review, the Court is tasked only with determining whether the Commissioner's decision is based upon correct legal standards and supported by substantial evidence. 42 U.S.C. § 405(g); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). The substantial-evidence standard does not require that the Commissioner's decision be supported by a preponderance of the evidence. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982) ("[A] factual issue in a benefits proceeding need not be resolved in accordance with the preponderance of the evidence . . . ."). Instead, the Commissioner's decision need only be supported by "more than a mere scintilla" of evidence and by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In deciding whether substantial evidence supports the Commissioner's findings, a court must examine the entire record and consider all evidence that could either support or contradict the Commissioner's determination. *See Jones ex rel. T.J. v. Astrue*, 07-CV-4886, 2010 WL 1049283, at *4 (E.D.N.Y. Mar. 17, 2010) (citing *Snell v. Apfel*, 171 F.3d 128, 132 (2d Cir. 1999)), *aff'd sub nom. Jones ex rel. Jones v. Comm'r of Soc. Sec.*, 432 F. App'x 23 (2d Cir. 2011). Still, a court must defer to the Commissioner's conclusions regarding the weight of conflicting evidence. *See Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)

(citing *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)). If the Commissioner's

findings are supported by substantial evidence, then they are conclusive and must be

affirmed. *Ortiz v. Comm'r of Soc. Sec.*, No. 15-CV-3966, 2016 WL 3264162, at *3 (E.D.N.Y.

June 14, 2016) (citing 42 U.S.C. § 405(g). Indeed, if supported by substantial evidence, the

Commissioner's findings must be sustained, even if substantial evidence could support a

contrary conclusion or where a court's independent analysis might differ from the

Commissioner's. *See Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)

(citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)).

## DISCUSSION

To be eligible for disability benefits under 42 U.S.C. § 423, a claimant must establish his

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which . . . has lasted or can be expected to last for a continuous

period of not less than twelve months," and the impairment must be of "such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any kind of substantial gainful work which exists in the national

economy." 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A); *see also Balsamo v. Chater*, 142 F.3d 75,

79 (2d Cir. 1998). Additionally, "an applicant must be 'insured for disability insurance

benefits'" at the time of disability onset. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)

(quoting *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); 42 U.S.C. §§ 423(a)(1)(A),

423(c)(1)).

The Commissioner's regulations prescribe the following five-step framework for

evaluating disability claims:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the Commissioner next considers whether

the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the burden of proof shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

The Commissioner argues that substantial evidence supports a finding that Plaintiff was not disabled under the Act.  (*See* Comm'r Mem. L. Supp. Mot. J. Pldngs ("Comm'r Mem."), ECF No. 18.)  The Court agrees.

## I.      Step 1: Plaintiff was not engaged in substantial gainful activity

At step one, the ALJ properly determined that Plaintiff had not been engaged in substantial gainful work activity since his alleged disability onset date of July 9, 2011.  (Tr. 993.) Despite records showing "earnings" after the alleged onset date from 2012 through 2016, Plaintiff testified that his earnings consisted of rental income from "investment properties abroad and benefits from the [VA]."  (Tr. 993, 1083–85, 1355.)  Plaintiff's 2017 tax returns and IRS form 1099-MISC for 2014, 2015, and 2017 corroborate his testimony.  (Tr. 993, 1357–64.)

## II.     Step 2: Plaintiff has the following severe impairments

At step two, the ALJ properly determined that Plaintiff had the following nine severe impairments: (1) degenerative disc disease of the cervical, thoracic, and lumbar spine, (Tr. 249, 252, 575); (2) tendinosis of the left shoulder, (Tr. 248, 580–81, 1379); (3) bilateral Achilles tendinosis with history of low-grade tears of the Achilles tendon and ligaments of the right ankle, (Tr. 381, 393–94); (4) fibromyalgia, (Tr. 385, 481–507); (5) pes planus and plantar fasciitis, (Tr.

286); (6) allergic rhinitis and asthma, (Tr. 326–27, 381, 509, 682); (7) migraine headaches

related to a traumatic brain injury in 1990, (Tr. 344, 346, 378); (8) obesity, (Tr. 361, 800, 809);

and (9) adjustment disorder with mixed anxiety and depressed mood and major depressive

disorder, (Tr. 324, 326, 369, 400, 486–88, 994.)

### III.    Step 3: Plaintiff's impairments do not meet or medically equal the criteria of one of the listed impairments

At step three, the ALJ properly determined that Plaintiff's impairments, alone or in

combination, did not meet or medically exceed the severity of any of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1, even when considering the effect of Plaintiff's obesity

on his musculoskeletal and respiratory systems in accordance with SSR 02-1p.  (Tr. 994.)

With respect to Plaintiff's tendinosis of the left shoulder, bilateral Achilles tendinosis

with history of low-grade tears of the Achilles tendon and ligaments of the right ankle, and pes

planus and plantar fasciitis, the ALJ looked to Listing 1.02.  An impairment under Listing 1.02 is

> [c]haracterized by gross anatomical deformity . . . and chronic joint pain and
> stiffness with signs of limitation of motion or other abnormal motion of the affected
> joint(s), and findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s) [. . .] [w]ith
> [i]nvolvement of one major peripheral weight-bearing joint . . . resulting in inability
> to ambulate effectively, as defined in 1.00B2b . . .[or] . . . [i]nvolvement of one
> major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand),
> resulting in inability to perform fine and gross movements effectively, as defined
> in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Sec. 1.02.  The ALJ's determination that Plaintiff was able

to ambulate and perform fine and gross movements effectively is supported by substantial

evidence.  (Tr. 247, 393–94, 512, 560–61.)  There is evidence in the record that Plaintiff suffered

from no more than tendinosis of the left shoulder and low-grade tear, (Tr. 248, 580–81), and that

Plaintiff suffered from only minimal tendinosis of the right ankle (from an Achilles tear), (Tr.

247, 381. 1493–98), necessitating the use of a cane only on occasion, (Tr. 310.).

With respect to degenerative disc disease of the cervical, thoracic, and lumbar spine, the ALJ looked to Listing 1.04. An impairment under Listing 1.04 is a disorder of the spine:

resulting in compromise of a nerve root . . . or the spinal cord, with . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test . . . ; [or] . . . [s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or [l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Sec. 1.04. The ALJ determined that the record showed no evidence of spinal arachnoiditis or pseudo-claudication. (Tr. 994.) The record consists of evidence showing no nerve root involvement and no clinical evidence of atrophy or muscle weakness, sensory or reflex loss, or positive straight leg raising. (Tr. 381, 393–94, 575, 580–81, 704, 807–08, 825, 836, 841, 846, 850.) Based on a letter from Doshi Diagnostic Imaging Services dated September 20, 2013, an x-ray of the lumbar spine with oblique views stated:

There is no evidence of fracture or subluxation of the lumbar vertebrae. The intervertebral disc spaces and interpedicular distances are preserved. There is no evidence of spondylolysis. There is a normal lumbar lordosis. The visualized soft tissues are unremarkable.

(Tr. 252.) Further, an internal medicine examination completed by Dr. Thurkal on May 15, 2015, indicated that both the cervical and lumbar spine showed "full flexion, extension, and lateral flexion," despite mild tenderness on movement. (Tr. 560–61.)

With respect to allergic rhinitis and asthma, the ALJ looked to Listing 3.03. An impairment under Listing 3.03 requires an:

FEV less than or equal to the value in Table VI-A or VI-B for your age, gender, and height without shoes measured within the same 12-month period . . . [and] [e]xacerbations or complications requiring three hospitalizations within a 12-month

12

period and at least 30 days apart. Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Sec. 3.03. The ALJ's determination that Plaintiff's allergic rhinitis asthma did not meet or exceed Listing 3.03 is supported by the record. Plaintiff presented no evidence that he met the required three hospitalizations within a 12-month period. Moreover, Plaintiff was "without persistent symptoms of asthma," using only an Albuterol inhaler daily. (Tr. 1583.) According to VA pulmonary outpatient consultants, Dr. Gowda and Dr. Chernyavskiy, Plaintiff's symptoms "seem[ed] to be in relation to specific [allergen] exposures." (Tr. 818, 825, 1424, 1482, 1582–84.)

With respect to migraine headaches related to a traumatic brain injury in 1990, the ALJ looked to Listing 11.18. Under Listing 11.18, traumatic brain injury is characterized by

(A) disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or (B) marked limitation in physical functioning, and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury: (1) understanding, remembering, or applying information; or (2) interacting with others; or (3) concentrating, persisting, or maintaining pace; or adapting or managing oneself

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Sec. 11.18. The ALJ correctly determined that "imaging signs of the head and brain have consistently been unremarkable[,] and the record shows no evidence of extreme disorganization of motor function or marked limitation in physical or mental functioning." (Tr. 995.) According to a September 4, 2014 evaluation by neurology attending physician, Dr. Galloway, Plaintiff was alert and oriented with a normal affect and displayed appropriate behavior. (Tr. 344–45.) No motor skill atrophy was noted, and Plaintiff had strength in five out of five extremities; no dysmetria, tremors or other involuntary movements; and normal gait. (Tr. 344–45.) Dr. Galloway also noted that the "[c]ognitive complaints are out of

13

proportion to the nature of the initially reported injury and MMSE." (*Id.*)  Further, an MRI scan taken on August 19, 2014, indicated no abnormalities.  (Tr. 394–95.)

With respect to adjustment disorder with mixed anxiety and depressed mood and major depressive disorder, the ALJ looked to listings 12.02, 12.04, and 12.06.  Listing 12.02 regards disability due to neurocognitive disorders; Listing 12.04 regards disability due to depressive, bipolar, and related disorders; and Listing 12.06 regards disability due to anxiety and obsessive-compulsive disorders.  These listings are each are comprised of three paragraphs, designated A, B, and C, and each require a plaintiff to satisfy either paragraphs A and B or A and C.  Paragraph A of each listing includes the medical criteria that must be present in the claimant's medical evidence.  Paragraph B requires "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; (4) adapt or manage oneself."  20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.02, 12.04, 12.06.  Paragraph C requires plaintiff's mental disorder to be "serious and persistent," that is, a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) marginal adjustment, that is, claimant has minimal capacity to adapt to changes in his/her environment or to demands that are not already part of his/her daily life.  *Id.*

Pursuant to paragraph B(1), the ALJ properly determined that Plaintiff has only a mild limitation in understanding, remembering, or applying information.  (*Id.*)  While Plaintiff reports memory loss on multiple occasions over the years, Plaintiff showed "no memory or cognitive deficits," and was capable of doing "some work as an accountant or tax preparer."  (Tr. 326, 353,

356–60, 370–71, 375–76.)  Pursuant to paragraph B(2), the ALJ the properly determined that Plaintiff has only a mild limitation in interacting with others.  (Tr. 997.)  The ALJ noted that while Plaintiff "reported irritability, a confrontational attitude, and social isolation, the record suggests good relations with family members and, upon examination, no treating or examining medical source over the years has noted inappropriate interpersonal interaction."  (Tr. 37–54, 1078–92.)  Pursuant to paragraph B(3), the ALJ correctly determined that Plaintiff was only moderately limited with regard to concentrating, persisting, or maintaining pace.  (Tr. 997.) While conceding that a history of migraine headaches would cause limitations, the ALJ pointed to the record, which established that Plaintiff has done non-substantial work as an accountant or tax preparer on occasion.  (Tr. 344, 668.)  Pursuant to paragraph B(4), the ALJ correctly determined that Plaintiff was only moderately limited in adapting or managing himself.  (Tr. 997.)  The ALJ stated that the record "documents a history of mood disorder, which with medication and psychotherapy is generally well controlled."  (*Id*.)  Pursuant to paragraph C, the ALJ properly determined that "there is no evidence of episodes of deterioration of extended duration that have required the claimant to be hospitalized, and there is no evidence that the claimant requires a highly structured living arrangement."  (Tr. 997.)

Plaintiff argues that the record shows incidents of and treatment for anxiety and insomnia, but that insomnia was never addressed in the ALJ's decision.  (Pl.'s Opp'n Comm'r Mot. J. Pldngs ("Pl.'s Opp'n") 8–9, ECF No. 21.)  Plaintiff urges that several listings apply to his insomnia, including listings 12.02; 12.04; and 12.06.  (*Id*.)  As evidence that he meets or medically equals the criteria of one these listings, Plaintiff directs the Court to the following:  (1) a mental disorder disability benefits questionnaire for an October 3, 2014 VA compensation and benefits exam, (Tr. 530–51); a May 18, 2015 progress note related to tobacco use disorder (Tr.

690); a 2017 mental status exam, (Tr. 1591–92); and a 2017 progress note, (Tr. 1712.). None of the evidence cited by Plaintiff discusses his insomnia. Even assuming Plaintiff has insomnia, the Court is unable to find any evidence in the record to support a finding that Plaintiff meets or medically equals the criteria of any of these listings.

Plaintiff next argues that the ALJ did not apply Criteria B of SSR 12-2p to his fibromyalgia. (Pl.'s Opp'n 13–14.) Plaintiff's argument is belied by the record. The ALJ specifically noted that while "the clinical record fails to document the requisite clinical findings [under SSR 12-2p], "I give the claimant the benefit of the doubt and include fibromyalgia as a[n] [MDI]."[2] (Tr. 995.) The ALJ made this determination based on the lengthy history of medical records indicating a diagnosis of fibromyalgia since 1995. (See Tr. 482–85, 508–21, 558–69.)

The ALJ's determination that Plaintiff has the RFC to perform sedentary work is also supported by substantial evidence in the record. (Tr. 998–1008.) The ALJ noted that Plaintiff would be limited to work that entails simple and routine tasks and that Plaintiff must avoid concentrated exposure to heat, cold, wetness, humidity, fumes, odors, dusts, gases and poor ventilation. (Id.) The ALJ determined that Plaintiff was limited to lifting up to 10 pounds and, in an 8-hour workday, could sit up to 6 hours and stand and/or walk up to 2 hours. (Tr. 1006.)

### A.      The ALJ properly evaluated the medical opinion evidence

---

[2] With respect to fibromyalgia, there is no formal listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. Accordingly, the ALJ was required to consider whether the fibromyalgia medically equals a listing or whether it medically equals a listing in combination with at least one other medically determinable impairment. See Social Security Ruling 12-2p. The ALJ did so. (Tr. 995–96.) In the 2015 decision, the ALJ specifically noted that Plaintiff's symptoms did not meet the symptoms of Inflammatory Arthritis under Listing 14.09, because the record did not document any clinical or laboratory findings—for example, no erythrocyte sedimentation rate and no anti-nuclear antibody, thyroid function, or rheumatoid factors were noted. (Tr. 20, 995.) In the 2018 decision, in addition to considering the longitudinal record of Plaintiff's fibromyalgia treatment and symptoms, the ALJ also considered the opinion of impartial medical expert, Dr. Gussoff, who noted that the diagnosis of fibromyalgia was based on vague symptoms of pain in the extremities but no objective data. (Tr. 995.) Dr. Gussoff noted that the examinations by treating sources contained no showings of trigger points and that laboratory findings were mostly benign. (Tr. 996.)

Plaintiff argues that the ALJ should have given controlling weight to the VA's February 11, 2019 rating decision and his treating physicians' opinions.  (Pl.'s Opp'n 7–8.)  As to the February 11, 2019 rating decision, Plaintiff maintains that it retroactively granted him "service connection for additional disabilities with an effective date of October 20, 2011 with the designation of 100% Permanently and Totally disabled and unemployable for the timeframe covered in his SSA claim."  (*Id*. 7.)  He claims that he faxed the decision to the Commissioner two months before his hearing and that "[i]t is apparent by the ALJ's decision and the Commissioner's motion that it was not weighed in the decision."  (*Id*. 7.)  This is unsurprising, as Plaintiff's hearing was held on March 20, 2018—almost a full year before any decision dated February 2019, could have been issued—and the ALJ issued her decision finding Plaintiff not disabled on May 30, 2018.  (Tr. 991–1010.)  Plaintiff's assertion is defeated by the facts.

Nonetheless, as the Commissioner points out, and as the ALJ noted with respect to the VA's 2014 rating decision, which designated him 70% disabled, the VA's assessments as to plaintiff's disabled status are not binding on the Commissioner.  *See* 20 C.F.R. § 404.1504 ("Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rule.").

As to the treating physicians, Plaintiff argues that the reasons given by the ALJ for providing less than controlling weight do not constitute good reasons.  (Pl.'s Opp'n 4.)  Under the treating physician rule, a treating source's opinion on the nature and severity of a claimant's impairment(s) is entitled to controlling weight where: (a) it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (b) it is "not inconsistent with the

other substantial evidence" of record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).  If not given controlling weight, the ALJ must give good reasons for the weight provided to the opinion.  20 C.F.R. 404.1527(c).  "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927."  SSR 96-2p. These factors include: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a relevant specialist.  *Id*.  After considering these factors, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion."  *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  "An ALJ's failure to explicitly apply the *Burgess* factors when assigning weight is a procedural error."  *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019).  If "the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment]," [the Court] is unable to conclude that the error was harmless and should remand for the ALJ to "comprehensively set forth [its] reasons."  *Id*.  If, however, "a searching review of the record" assures the court "that the substance of the treating physician rule was not traversed," the court should affirm.  *Id.*

Contrary to Plaintiff's assertions, treating physicians' opinions that are not consistent with other substantial evidence in the record or are contradicted by evidence in the record are not entitled to controlling weight.  *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)  ("[T]he opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."); *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.

2002) (stating that treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record").

Here, Dr. Wing opined that Plaintiff had disturbance in motivation and mood and difficulty establishing work and social relationships. (Tr. 543). The ALJ afforded little weight to this opinion because it was inconsistent with the other evidence of record regarding Plaintiff's mental health. (Tr. 1007.) Specifically, Plaintiff's mental status examinations remained generally unremarkable throughout the treatment record, and Plaintiff consistently had appropriate affect, intact memory, normal attention and concentration, and good insight, judgment, and impulse control. (*See* Tr. 1005, Tr. 356, 669, 692, 730, 1417–18, 1440, 1481, 1503–04, 1541–42, 1562, 1712–13.)

Plaintiff next argues that the ALJ committed legal error by giving great weight to the opinions of non-treating doctors, Dr. Clark, Dr. Gussoff, Dr. Thurkal, and Dr. Fkiaras. (Pl.'s Opp'n 6.) A consultative examiner's opinion may constitute substantial evidence in support of the ALJ's RFC finding. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The report of a consultative physician may constitute [ ] substantial evidence [by which to compare the treating physician's opinion]."); *Diaz v. Shalala*, 59 F.3d 307, 313, n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993) (recognizing that the opinions of non-examining sources may override treating sources' opinions, provided they are supported by evidence in the record)).

Here, Dr. Clark opined that Plaintiff did not meet or medically equal the criteria for Listings 12.02, 12.04, or 12.06, and that Plaintiff could perform simple, low stress work with limited public contact. (Tr. 888–891.) The ALJ accorded significant weight to this opinion. (Tr. 1008.) The ALJ indicated that the opinion limiting Plaintiff to simple tasks was supported by

Plaintiff's mental health notes. (*Id*.) The ALJ noted that while Dr. Clark indicated moderate difficulties in social functioning, Plaintiff's treatment records did not indicate any inappropriate personal interaction. (Tr. 997.) Plaintiff asserts that Dr. Clark's opinion was "pure speculation." (Pl. Opp'n at 4–5). Not so. Dr. Clark reviewed the evidence of record available as of August 2015 before she rendered her opinion. (Tr. 891.)

The ALJ also afforded significant weight to the opinion of Dr. Gussoff, the medical expert who completed a medical source statement regarding Plaintiff's physical abilities in August 2015. (Tr. 1008.) Dr. Gussoff opined that Plaintiff could lift/carry up to 20 pounds occasionally and up to 10 pounds frequently; sit six hours in a workday; and stand/walk four hours in a workday. (Tr. 892–93.) The ALJ noted that this was generally supported by the medical evidence of record. (Tr. 1008.) For instance, Plaintiff consistently had normal strength and reflex findings during the relevant period. (Tr. 1002–04; *see* Tr. 512, 561, 636, 966, 1465, 1496, 1576–77.)

Dr. Thurkal opined that Plaintiff had no limitations for sitting or standing but had mild limitations on pulling, pushing, lifting, carrying due to neck pain, low backache, and fibromyalgia. (Tr. 1003–04.) Dr. Thurkal further opined that Plaintiff could lift and/or carry up to 20 pounds and in an 8-hour workday, could sit, stand, and/or walk up to 8 hours, could use feet and hands frequently, and could engage in postural activities like balancing, stooping, kneeling, crouching and crawling frequently. (*Id*.) The ALJ properly afforded some weight to these opinions, noting that they were largely consistent with the mostly unremarkable clinical findings. (*Id*., Tr. 558–68, 1008.)

Dr. Fkiaras opined that Plaintiff could lift and/or carry up to 10 pounds and could sit up to 4 hours in an 8-hour workday, stand up to 45 minutes, and walk up to 40 minutes. (Tr. 516.)

Dr. Fkiaras also opined Plaintiff could not push or pull or operate foot controls and could not climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.  (Tr. 517–18.)  The ALJ properly awarded little weight to these opinions because they appeared not to be based on clinical findings and were inconsistent with Dr. Thurkal's findings.  (Tr. 1003.)  When examined by Dr. Fkiaras, Plaintiff only had one trigger point, no muscle atrophy, and no reflex, sensory, or strength deficits.  (*Id.*, Tr. 512).  Moreover, Dr. Fkiaras' opinions were not consistent with other evidence of record regarding Plaintiff's physical limitations.  (Tr. 1003.)  For example, despite Plaintiff having issues with his Achilles tendons during the relevant period, he also had instances of normal gait throughout the relevant period.  (Tr. 345, 560, 636, 1001–02, 1004, 1435, 2443.)

### B.    The ALJ properly developed the record

On May 11, 2017, the Honorable Carol Bagley Amon granted the Commissioner's motion to remand the 2015 ALJ decision because, although "treatment records available to the ALJ clearly indicate[d] that [Plaintiff] received treatment from providers[3] other than those that the ALJ considered," the "ALJ neither inquired as to [Plaintiff's] other treating physicians before or during the hearing, and the ALJ made his decision without the benefit of treatment records from those physicians."  (Tr. 1097.)  Indeed, the Commissioner conceded that "records from Northport—the provider noted in the ALJ's decision—clearly identify [Plaintiff's] outside providers . . . and include a telephone number to contact these providers," but that the ALJ failed to "make any attempt to seek treatment notes from those physicians."  (*Id.*)  The ALJ was directed to develop the record, accordingly.  (Tr. 1099.)  Plaintiff argues that the ALJ failed to do so.  (Pl.'s Opp'n 2–3.)

---

[3] Treatment records showed that Plaintiff was treated by other doctors since at least November 2011, several months after his alleged onset date.  (Tr. 1097.)

He first maintains that the ALJ did not request an updated opinion from Dr. Clark despite Dr. Clark's attestation that:  (1) "she does not have sufficient objective medical evidence . . . to allow her to form opinions about the nature and severity of [Plaintiff's] impairments[sic] . . . .;" and (2) "Dr. Gussoff's testimony was not based on the totality of [Plaintiff's] medical record when the ALJ injected his medical opinion on [Plaintiff's] disabilities instead of relying on the medical expert [testimony]."  (Pl.'s Opp'n 2, 9.)  Plaintiff's argument is misplaced.  The May 11, 2018 remand order does not contemplate the ALJ requesting updated records from physicians whose records were already considered at the 2015 Hearing.  What the order contemplates is the consideration of treatment notes from physicians the ALJ did not contact at the 2015 Hearing because that evidence "may in fact directly contradict the evidence upon which the ALJ relied in reaching its decision."  (Tr. 1099 (citing *Clark v. Comm'r of Soc. Sec*. 143 F.3d 115,118 (2d Cir. 1998)).

Plaintiff does not point any other specific records, if any, missing from the medical evidence.  Indeed, at the 2018 Hearing, when asked by the ALJ whether any records were missing at this point, Plaintiff's counsel responded, "I don't believe any, your honor."  (Tr. 1081.)  As instructed, evidence in the record was otherwise updated as directed on remand.  (Tr. 1252-59.)  On January 11, 2018, the Appeals Council requested the ALJ to "[f]urther develop the record with requests . . . from Dr. Raskin, Dr. Fitzpatrick, and any other relevant medical sources."  (Tr. 1268–69.)  Subsequently, the ALJ issued a subpoena to Dr. Raskin who provided his records, (Tr. 1298, 1392–93); the ALJ also issued a subpoena to Dr. Fitzpatrick who also provided her records, (Tr. 1304, 2440–48); and the ALJ issued subpoenas for records from the

VAMC and Dr. Raz Winarsky.[4]  (Tr. 1292, 1310.)  Accordingly, the Court finds that the ALJ adequately developed the record.

## IV.    Step 4: Plaintiff is unable to perform any past relevant work

At step four, the ALJ properly determined that Plaintiff is unable to perform any past relevant work.  (Tr. 1008.)  Indeed, because the record does not document earnings associated with substantial gainful work activity for the past 15 years, the ALJ found that Plaintiff has no past relevant work.  (*Id.*)

## V.    Step 5: There is other work which Plaintiff could perform

At step five, the ALJ's determination that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including Surveillance Systems Monitor, Order Clerk, and Lens Inserter, is supported.  (Tr. 1008–09.)  Each of the occupations were consistent with Plaintiff's vocational profile and capacity and, pursuant to SSR 00-4p, the ALJ determined that the vocational expert's testimony was consistent with the DOT and supporting publications.  (Tr. 1009.)

## CONCLUSION

---

[4] Plaintiff also argues that "three years of medical records before the Commissioner," particularly a February 2019 rating decision by the Department of Veteran Affairs (the "2019 Decision") that "retroactively granted Plaintiff service connection for additional disabilities with an effective date of October 20, 2011, with the designation of 100% Permanently and Totally (P&T) disabled and unemployable for the timeframe covered in his SSA claim," were "not reviewed and opined on by an expert of the Commissioner's choosing."  (Pl.'s Opp'n 3.)  Plaintiff directs the Court to the ALJ's 2018 decision as well as the Commissioner's cross-motion, which Plaintiff maintains both "only reference[] the VA's 2014 decision."  (*Id.*)  According to Plaintiff, the ALJ's 2018 decision is essentially a carbon copy of his original decision.  (Pl.'s Opp'n 17.)  The Court, *supra*, has already addressed Plaintiff's argument on the 2019 VA rating decision.  Regardless, any similarities between the 2015 and 2018 ALJ decisions does not necessarily evince that the ALJ failed to consider the updated record, as Plaintiff suggests.

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is GRANTED.  Pursuant to 42 U.S.C. § 405(g), the final decision of the Commissioner is AFFIRMED.[5]

SO ORDERED.

Dated: Brooklyn, New York
      January 19, 2021

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

---

[5] Plaintiff urges remand for calculation of benefits.  (Pl. Opp'n at 16, 19.)  Remand for payment of benefits is only appropriate where the evidence shows persuasive proof of disability such that there is no purpose for further proceedings.  *See Williams v. Apfel*, 204 F. 3d 48, 50 (2d Cir. 1999) (providing that an award of benefits is appropriate only where the record "provided persuasive evidence of total disability that rendered any further proceedings pointless").  Such is not the case here.  Plaintiff also argues that he was entitled to expedition of his DIB claim pursuant to the Hearings, Appeals, and Litigation Law Manual ("HALLEX").  (Pl.'s Mot. 18.)  As an initial matter, Plaintiff was only determined to be 70% disabled.  (Tr. 909–15.)  In any event, when a claimant has received a 100% permanent and total disability compensation rating from the VA, a case is designated as critical.  *See* HALLEX I-2-1-40(A)(2).  However, courts in this district have held that "a failure to follow procedures outlined in HALLEX does not constitute legal error."  *Smith v. Colvin*, 14-CV-5868, 2016 WL 5395841, at *21 (E.D.N.Y. Sep. 27, 2016) (quoting *Valet v. Astrue*, 10-CV-3282, 2012 WL 194970, at *12 n.21 (E.D.N.Y. Jan. 23, 2012) (collecting cases)); *see also Harper v. Comm'r of Soc. Sec.*, 08-CV-3803, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010) (cautioning against "frivolous appeals to the HALLEX" because that publication "is simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner" and therefore, "[a] failure to follow procedures outlined in HALLEX . . . does not constitute legal error").